# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| TWIN HARBORS FISH AND WILDLIFE ADVOCACY, a Washington nonprofit corporation, | No.  54849-6-II |
| Appellant, | |
| v. | |
| WASHINGTON DEPARTMENT OF FISH AND WILDLIFE, an agency of the State of Washington, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, C.J. — Twin Harbors Fish and Wildlife Advocacy appeals the superior court's order dismissing its Public Records Act (PRA)[1] claims against the Department of Fish and Wildlife (WDFW).  Twin Harbors argues that the superior court erred in concluding that Twin Harbors was not denied the opportunity to inspect public records and that the WDFW complied with the prompt response requirement of the PRA.  Twin Harbors also argues that it is entitled to PRA penalties and attorney fees.  We hold that the superior court did not err and affirm the superior court's order dismissing Twin Harbors' PRA claim.

---

[1]  Ch. 42.56 RCW.

FACTS

A.   BACKGROUND—THE NORTH OF FALCON PROCESS

In Washington, recreational and commercial fisheries are planned each year through a federal, state, and tribal co-management process known as "North of Falcon." Clerks Papers (CP) at 1266. The areas covered by the North of Falcon process include the Columbia River, coastal Washington, and the Puget Sound.

The North of Falcon process is a series of negotiations between affected states, treaty tribes, and the federal government. Throughout the process, WDFW staff constantly engage with tribal co-managers, fisheries managers from other states, federal agency staff, and constituents from Washington through numerous in-person meetings and email communications.

Relevant here, the negotiations between the WDFW and Puget Sound Treaty Tribes culminate into a "List of Agreed Fisheries" (LOAF). CP at 1268. The LOAF is a significant step in the development of the fishing regulations for the Puget Sound each year. The LOAF is subject to approval by the National Marine Fisheries Service and further alteration before being adopted as the final fishing regulations for the season. The WDFW incorporates the North of Falcon negotiations into its final fishing regulations each year, which are promulgated under the Washington Administrative Procedure Act (APA).

Policy level decisions and co-management negotiations reflected in the LOAF are based on technical data generated by WDFW staff and exchanged with tribal staff. Communications between WDFW and tribal staff related to pre-season forecast, fish available for harvest, and prior intercept modeling include technical data and communications concerning technical issues.

No. 54849-6-II

B.    TWIN HARBORS' PRA REQUEST

On October 23, 2016, Twin Harbors' president, Tim Hamilton, filed a PRA request with

the WDFW.  Twin Harbors requested that the WDFW provide

> any and all documents and communications that are related to:
>
> 1. The [Harvest Co-Management Proceedings (HCMP)] proceedings for 2016 seasons resulting in the agreed upon seasons contained in the attached agreement between tribal and state Co-Managers titled *"2016-17 Co-Managers [LOAF] (May 1, 2016-April 30, 2017)"*;
>
> 2. Any federal rule, policy or guidance that WDFW considered during its interactions with tribal Co-Managers that could result in a federal agency approving tribal fisheries without approving a state sponsored fisheries in Puget Sound in either 2015 or 2016;
>
> 3. Any internal WDFW policy or guidance and any understanding(s) between WDFW and a tribal Co-Managers(s) that were used or followed in the HCMP proceedings related to:
>
>    a.  the location of Co-Management meetings;
>    b.  record keeping of Co-Management meetings;
>    c.  notification to the public of Co-Management meeting locations and times;
>    d.  tribal or nontribal citizens having the ability to attend and observe HCMP meetings in progress; and
>    e.  a fishing season agreement(s) reached between Co-Managers will be adopted as a rule (WAC) by WDFW in the [North of Falcon] proceedings.
>
> 4. Any internal policy or guidances or external understanding between WDFW and a tribal Co-Managers(s) or a third party wherein seasons agreed to by Co-Managers can deviate from the "50/50 share in common" as set forth in U.S. v-WA (Boldt decision).

CP at 67.

Twin Harbors' PRA request provided a list of definitions for the specific terms used in the

request, which in relevant part state:

3

"Communications" means any mailed, faxed, or electronically transmitted correspondence, including any attachment that accompanied the communication, that were created, transmitted, received or reviewed by WDFW from January 1, 2015 to present including those transmitted internally within WDFW or between WDFW and a third party.

"Document" means any presentation, work product, analysis, briefing materials, conversation notes, meeting minutes or electronic recordings, meeting notices, outlines, or documentation of any kind (whether produced by WDFW or a third party), that came into WDFW's possession in the period from January 1, 2015 to present.

. . . .

"North of Falcon" or "NOF" means the proceedings used to adopt state sponsored fishing seasons in Puget Sound wherein WDFW holds public meetings or hearing processes following the [APA] that results in the adoption of a WAC or rule containing harvest seasons.

"Harvest Co-Management Proceedings" or "HCMP" means communications, discussions or meetings occurring between representatives of WDFW, a tribe(s), or a federal agency conducted outside the view of the general public and the topics includes [sic] a tribal or state fishing harvest season. As clarification, HCMP does not mean those public processes held by WDFW in the NOF proceedings as defined above. Additionally, interactions between technical staff within WDFW and tribal Co-Managers wherein harvest season(s) is not a topic are excluded from this definition.

CP at 66-67. Twin Harbors directed the WDFW to liberally construe the above terms.

C.    THE WDFW'S INITIAL RESPONSE & CLARIFICATION ATTEMPTS

The WDFW responded to Twin Harbors' PRA request on October 28, which was within five business days of receiving the request. In its response, the WDFW acknowledged receipt of the PRA request; advised Hamilton that the WDFW would be contacting him to clarify the request; and stated that, pending clarification, the WDFW would be able to respond to the request by November 22, 2016.

On October 28, Kelly Cunningham, the director for the WDFW's Fish Program, met with Hamilton to clarify the scope of Twin Harbors' PRA request. At the meeting, Cunningham explained that voluminous communications are exchanged during the North of Falcon process because technical staff must finalize the previous year's return data and develop pre-season forecasts for the upcoming season. Hamilton stated that he was not interested in those technical exchanges.

On October 29, Hamilton sent an email to the WDFW, stating that the October 28 meeting "should not be considered [as] a modification of the written text contained in [the PRA request]. Any modifications would need to come in the form of a written amendment transmitted to the [WDFW] by [Twin Harbors]." CP at 1453.

On October 31, Cunningham followed up with Hamilton through email. Cunningham's comments memorialized the WDFW's meeting with Hamilton and stated that Twin Harbors was not "requesting records from technical staff to include communications between technical staff." CP at 1325. Hamilton responded on the same day and stated that "I previously transmitted that the text of [the PRA request] remains unamended by our conversations in Olympia. I'd add the same holds true for this or future email communications." CP at 1325. Hamilton also stated that "communications between technical staff that are related to co-management discussions on an upcoming season would be included in the scope [of the PRA request]. Examples would be preseason forecast, fish available for harvest, prior intercept modeling, etc." CP at 1325.

On November 8, the WDFW emailed to Hamilton an item-by-item interpretation of Twin Harbors' PRA request. On November 9, Hamilton responded and stated that he was not seeking

communications between technical staff simply relaying technical information, but that he was seeking communications related to co-management discussions on an upcoming season, such as pre-season forecasts. "This clarification did little to narrow the scope of [the PRA request] in light of the large volume of communications exchanged during the pre-season forecast process." CP at 1316.

On November 22, the WDFW sent an email to Hamilton informing him that the WDFW needed additional time to respond to Twin Harbors' PRA request. The WDFW stated that it would respond to the request by December 6.

On December 6, Theresa Gibbs, the WDFW's public records officer at the time, disclosed to Twin Harbors the first installment of responsive records via email. Gibbs advised Twin Harbors that the second installment of responsive records would be available no later than January 5, 2017. In the same email, Gibbs also attached the WDFW's formal interpretation of Twin Harbors' PRA request. Hamilton acknowledged receipt of Gibbs' email and did not object to the WDFW's interpretation of Twin Harbors' PRA request.

D.       THE WDFW'S RESPONSE PROCESS TO TWIN HARBORS' PRA REQUEST

Anne Masias is the WDFW's public records officer. According to Masias, the WDFW consists of multiple programs, one of which is the Fish Program. Each program has a designated public records coordinator. Masias receives and reviews all of the WDFW's public records requests, then either assumes responsibility or assigns a public records analyst to respond. Once a request is reviewed, Masias or a public records analyst would then reach out to the program that may be the potential holders of responsive records.

At the time of Twin Harbors' PRA request, Robin Jones was the Fish Program's public records coordinator. According to Jones, she received a list of WDFW staff who were involved in the 2016 North of Falcon season, which identified those who likely had responsive records. On December 2, 2016, Jones submitted Twin Harbors' PRA request to all Fish Program staff who potentially held responsive records, along with the WDFW's interpretation of the request as communicated to Hamilton.

Jones created a list of search terms for the WDFW's Discovery Accelerator search. Discovery Accelerator is a program that the WDFW uses agency-wide to search vaulted e-mails. The search results appear as random numbers and cannot be exported to appear by subject. Accordingly, in order to determine whether a particular search result is responsive to Twin Harbors' PRA request, the WDFW needed to open and review each file.

Staff within the Fish Program conducted the records search. If the records were responsive, then staff had to determine whether an applicable exemption may apply and flag it for the public records coordinator's review. Kirt Hughes, the WDFW's statewide salmon and steelhead manager, stated that it takes approximately one hour to review 60 pages of records.

The WDFW staff searched various locations to identify records responsive to Twin Harbors' PRA request. Fish Program staff kept documents stored on agency-issued computers. Some program staff maintained hard copy records in notebooks, desks, and filing cabinets in their offices. Records were are also kept on the agency's S: Drive and in external hard drives. The record shows that numerous WDFW staff members searched their emails, hard copy notes, agency-issued hard drives, central electronic drives, desks, filing cabinets, and external hard drives.

Ron Warren, the Fish Program's assistant director at the time Twin Harbors made its PRA request, stated that Twin Harbors' request was one of the broadest public records requests that the Fish Program had received. This is due to the broad language of the request and the complexity of the WDFW's co-management of Washington fisheries. Warren explained that over 50 WDFW staff members participate in the North of Falcon process, the development of the LOAF, or both. And, as discussed above, WDFW staff's responsibilities include engaging with numerous government entities multiple times per day through in-person meetings or email.

The WDFW attempted to speed up the search and production process for Twin Harbors' PRA request. Warren stated that he scheduled all-day meetings with WDFW staff to review approximately 100,000 records identified as potentially responsive to Twin Harbors' PRA request. The meetings occurred on February 2 through February 3, 2017, and on March 2 through March 3, 2017. The WDFW staff were directed to err on the side of disclosure.

Kelly McDermott, the current Fish Program's public records coordinator, stated that they also identified 152,469 potentially responsive emails from Fish Program staff through the Discovery Accelerator program. As of September 30, 2019, McDermott still had approximately 82,000 records to review and provide to Masias. McDermott further stated that she was responsible for 69 other PRA requests for the Fish Program.

Once responsive records were identified, the public records coordinator would provide them to Masias for final review. Masias' rate of review depends on each individual record. For example, she could quickly scan responsive emails that do not contain technical or complex information. But emails that contain exempt information, or emails with attachments, would take

more time to review because of the technological steps she must take to get the records ready for production. And with records containing technical information, Masias would have to consult with Fish Program staff to understand the nature of the data, which could potentially be exempt under the PRA.

Once reviewed and marked with the applicable redactions, Masias would produce the records in installments. Masias stated that there are approximately 5,149 pages or records containing sensitive information awaiting her final review and production. Masias also stated that she was responsible for 54 other PRA requests.

As of September 30, 2019, the WDFW had 234 open PRA requests with 606 itemized sub-requests. Although the WDFW responds to PRA requests in the order they are received, it works on all pending requests at the same time.

As of July 14, 2020, Masias had provided Twin Harbors with 38 installments of records responsive to its PRA request. The WDFW is still providing regular installments of records to Twin Harbors.

E.    PROCEDURAL HISTORY

On June 28, 2019, Twin Harbors filed a complaint in Thurston County Superior Court, alleging that the WDFW violated the PRA. On February 20, 2020, Twin Harbors filed an amended complaint. In its amended complaint, Twin Harbors alleged that the WDFW violated the PRA's prompt response requirement by providing unreasonable estimates of the time to respond and unduly delaying the production of requested records. Twin Harbors also alleged that the WDFW

denied it an opportunity to inspect records. CP 62, PDF 63. Twin Harbors further requested PRA penalties and attorney fees.

Twin Harbors submitted briefing for a decision on the merits. CP 1006, Vol. 2 PDF 517. Twin Harbors contended that the WDFW would have had a majority of the responsive records in one location if it had maintained a rulemaking file, but the WDFW failed to maintain a rulemaking file as required by the APA. Twin Harbors argued that, based on WDFW's failure to maintain a rulemaking file as required under the APA, WDFW's estimates of time necessary to respond to the PRA request were unreasonable. Twin Harbors also argued that the WDFW unduly delayed producing the requested records and denied Twin Harbors the opportunity to inspect the requested records.

In response, the WDFW argued that Twin Harbors' APA argument regarding the failure to maintain a rulemaking file was not properly before the superior court. WDFW contended that it had complied with the PRA because it provided reasonable estimates of time in which it expected to respond to Twin Harbors' request and because it acted with reasonable thoroughness and diligence in its response. The WDFW also argued that Twin Harbors' remaining claims related to the alleged denial of inspecting records were premature.

The superior court agreed with the WDFW, concluding that Twin Harbors' claim that it was denied the opportunity to inspect the requested records was premature. The superior court also concluded that the WDFW's estimates of time to respond to Twin Harbors' PRA request were reasonable. The superior court further concluded that the WDFW's response to Twin Harbors'

request was reasonably diligent and thorough in compliance with the PRA.  Accordingly, the superior court dismissed Twin Harbors' PRA claims.

Twin Harbors appeals.

ANALYSIS

"'The PRA mandates the broad disclosure of public records.'"  *Freedom Found. v. Dep't of Soc. and Health Servs.*, 9 Wn. App. 2d 654, 663, 445 P.3d 971 (2019) (quoting *SEIU 775 v. Dep't of Soc. and Health Servs.*, 198 Wn. App. 745, 749, 396 P.3d 369, *review denied*, 189 Wn.2d 1011 (2017)), *review denied*, 194 Wn.2d 1017 (2020).  "Accordingly, state agencies have 'an affirmative obligation to disclose records requested under the PRA unless a specific exemption applies.'"  *Id*. (quoting *SEIU 775*, 198 Wn. App. at 749).  We review an agency's action in responding to a PRA request de novo.  RCW 42.56.550(3).

A.  PREMATURE LITIGATION

Twin Harbors argues that the superior court erred in concluding that it "was not denied the opportunity to inspect records."  Br. of Appellant at 6.  We disagree.

Under RCW 42.56.550(1), the superior court may hear a motion to show cause when a person has "been denied an opportunity to inspect or copy a public record by an agency."  Therefore, "[i]n an action challenging an agency's *denial* of a records request, a requestor cannot initiate a lawsuit until the agency has denied and closed the request at issue."  *Freedom Found.*, 9 Wn. App. 2d at 664.

RCW 42.56.520 states,

> (4) Denials of requests must be accompanied by a written statement of the specific reasons therefor.  Agencies, the office of the secretary of the senate, and

the office of the chief clerk of the house of representatives shall establish mechanisms for the most prompt possible review of decisions denying inspection, and such review shall be deemed completed at the end of the second business day following the denial of inspection and shall constitute *final agency action or final action* by the office of the secretary of the senate or the office of the chief clerk of the house of representatives for the purposes of judicial review.

(Emphasis added.) The language in RCW 42.56.520(4) itself refers to "final agency action or final action." Accordingly, before a requester initiates a PRA lawsuit based on an alleged denial of "an opportunity to inspect or copy a public record by an agency," there must be some agency action, or inaction, indicating that the agency will no longer be providing responsive records. *Hobbs v. State*, 183 Wn. App. 925, 936-37, 335 P.3d 1004 (2014) (holding that requestor could not initiate a lawsuit while the agency was still providing installments of responsive records).

Here, there is no dispute that the WDFW is still providing installments of public records in response to Twin Harbors' PRA request. Because the WDFW is still providing installments of public records to Twin Harbors, there has been no "denial" of records forming a basis for PRA denial claim. *See id.* Therefore, the superior court did not err in dismissing Twin Harbors' claim relating to the WDFW's alleged denial of the opportunity to inspect requested records. Accordingly, we affirm the superior court's dismissal of Twin Harbors' PRA claim that it was denied the opportunity to inspect public records.

B.      PROMPT RESPONSE REQUIREMENT

Twin Harbors argues that the superior court erred in concluding that the WDFW complied with the prompt response requirement of RCW 42.56.520. We disagree.

12

1. Legal Principles

Agencies must respond promptly to a public records request. RCW 42.56.520(1); *Rufin v. City of Seattle*, 199 Wn. App. 348, 359, 398 P.3d 1237 (2017), *review denied*, 189 Wn.2d 1034 (2018). The PRA requires agencies to provide the "'fullest assistance'" and the "'most timely possible action on requests for information.'" *Freedom Found.*, 9 Wn. App. 2d at 673 (internal quotation marks omitted) (quoting *Andrews v. Wash. State Patrol*, 183 Wn. App. 644, 651, 334 P.3d 94 (2014), *review denied*, 182 Wn.2d 1011 (2015)); RCW 42.56.100. "[T]he purpose of the PRA is for agencies to respond with reasonable thoroughness and diligence to public records requests." *Andrews*, 183 Wn. App. at 653. "Whether the agency responded with reasonable thoroughness and diligence is a fact-specific inquiry." *Freedom Found.*, 9 Wn. App. 2d at 673.

RCW 42.56.520(1) requires an agency to respond to a request within five business days of receiving a PRA request. "An agency must provide the records, deny the request, or respond in one of three other ways." *Freedom Found.*, 9 Wn. App. 2d at 665. One of those ways is to acknowledge receipt of the request and "ask[] the requestor to provide clarification for a request that is unclear, and provid[e], to the greatest extent possible, a reasonable estimate of the time the agency . . . will require to respond to the request if it is not clarified." RCW 42.56.520(1)(d). The PRA provides a cause of action "when an agency has not made a reasonable estimate of the time required to respond to the request." *Andrews*, 183 Wn. App. at 651; RCW 42.56.550(2).

RCW 42.56.520(2) provides further guidance regarding an agency's reasonable estimated response time:

> Additional time required to respond to a request may be based upon the need to clarify the intent of the request, to locate and assemble the information requested,

to notify third persons or agencies affected by the request, or to determine whether any of the information requested is exempt and that a denial should be made as to all or part of the request.

*See also Freedom Found.*, 9 Wn. App. 2d at 665. The reasonableness of an estimated response time may depend on the number of records requested and the difficulty in gathering and reviewing the requested records. *See Ockerman v. King County Dep't of Developmental & Envtl. Servs.*, 102 Wn. App. 212, 218, 6 P.3d 1214 (2000).

Under the PRA, an agency may make the records available on an installment basis. RCW 42.56.080(2). The PRA does not require an agency to include an estimate of when it will fully respond to the request in its initial response. *Health Pros Northwest, Inc. v. State*, 10 Wn. App. 2d 605, 622, 449 P.3d 303 (2019), *review denied*, 194 Wn.2d 1025 (2020). RCW 42.56.550(2) applies to all time estimates and not just the estimate for the initial installment. *Id.* at 621. The agency maintains the burden of proof to show that its time estimates were reasonable. RCW 42.56.550(2); *see also Freedom Found.*, 9 Wn. App. 2d at 666.

2.      Twin Harbors' APA Claim Is Not Properly Before This Court

Twin Harbors contends that an agency's failure to perform a duty under the APA can also serve as a violation of the PRA's prompt response requirement. Specifically, Twin Harbors asserts that the WDFW does not maintain a rulemaking file as required by RCW 34.05.370, which requires the compilation of all materials important to the creation of an agency rule in one location. Twin Harbors contends that, had the WDFW maintained a rulemaking file as required under the APA, then the WDFW could have immediately provided a majority of the requested records, and therefore, its estimated response times were not reasonable.

The APA requires an agency to maintain an official rulemaking file for each rule that it proposes or adopts. RCW 34.05.370(1). The rulemaking file must contain "[a]ll written petitions, requests, submissions, and comments received by the agency and all other written material regarded by the agency as important to adoption of the rule." RCW 34.05.370(2)(c). The rulemaking file must also contain "[c]itations to data, factual information, studies, or reports on which the agency relies in the adoption of the rule, indicating where such data, factual information, studies, or reports are available for review by the public." RCW 34.05.370(2)(f). "The file and materials incorporated by reference shall be available for public inspection." RCW 34.05.370(1).

RCW 34.05.570(4)(b) provides that "[a] person whose rights are violated by an agency's failure to perform a duty that is required by law to be performed may file a petition for review . . . seeking an order pursuant to this subsection requiring performance." Furthermore, RCW 34.05.510 provides that "[t]his chapter establishes the exclusive means of judicial review of agency action." The term "agency action" means "the adoption or application of an agency rule." RCW 34.05.010(3).

Here, Twin Harbors' complaint is based on the WDFW's alleged failure to comply with the PRA, not the APA. Because a party seeking redress based on an agency's alleged failure to perform a duty under the APA must seek an order pursuant to the APA, and because the APA provides "the exclusive means of judicial review of agency action," Twin Harbors' claim that the WDFW violated the APA is not properly before this court. RCW 34.05.570(4)(b); RCW 34.05.510.

15

Moreover, Twin Harbors' PRA request cannot reasonably be construed as a request for the WDFW's rulemaking file. Based on the language of the request, Twin Harbors asked for any and all documents or communications from January 1, 2015 to October 23, 2016 related to the 2016–17 North of Falcon and LOAF setting process. But under RCW 34.05.530(2), a rulemaking file only needs to include written material that is regarded as important, or actually relied on, in the adoption of a final rule. Because Twin Harbors' request implicates records that far exceed documents relied on by the WDFW in setting the final fishing regulations, Twin Harbors' PRA request was not a request for the WDFW's rulemaking file. Accordingly, Twin Harbors' APA argument fails.

3.      No Undue Delay Of Production

Twin Harbors contends that the superior court erred when it dismissed Twin Harbors' PRA claim because the WDFW improperly used the installment procedure and estimated response times to unduly delay its response. We disagree.

Here, the record shows that the WDFW responded to Twin Harbor's PRA request within the statutorily required five-day period and immediately sought to clarify the scope of the request. The WDFW met with Hamilton the same day it responded to Twin Harbors' request and exchanged correspondence with Hamilton in an effort to understand the type of technical communications included within the request.

Additionally, the WDFW reached out to all Fish Program staff who were involved in the 2016 North of Falcon season and provided each with Twin Harbors' request, along with the WDFW's formal interpretation of the request that was communicated to Hamilton. The record

further demonstrates that over 50 WDFW staff searched various locations, such as emails, agency issued computers, hard copy notebooks, and offices for responsive records. The WDFW even set all-day meetings in early 2017 to review the approximately 100,000 records that had been identified as potentially responsive to Twin Harbors' PRA request.

Furthermore, the record shows that the public records officer provided Twin Harbors with 38 installments of response records as of July 14, 2020. Therefore, since December 2016, WDFW had provided Twin Harbors with installments of records in approximately one month intervals.[2] This was in addition to the WDFW staff's existing workload and other PRA requests to which it had to respond.

Twin Harbors fails to show based on the record before this court that the WDFW improperly used the installment procedure and estimated response times to unduly delay its response. Therefore, Twin Harbors' claim fails.

C.     PRA PENALTIES OR ATTORNEY FEES

Twin Harbors argues that the superior court erred in concluding that it was not entitled to PRA penalties or attorney fees. We disagree.

"We review a superior court's award of penalties under the PRA for an abuse of discretion." *Bricker v. Dep't of Labor & Indus.*, 164 Wn. App. 16, 21, 262 P.3d 121 (2011). "An abuse of discretion occurs when a decision is manifestly unreasonable or exercised on untenable grounds

---

[2] COVID-19 caused a statewide government shutdown and furloughs beginning in March 2020. Because COVID-19 impacted its workload capacity, WDFW began advising PRA requestors that longer than usual response times would result.

or for untenable reasons." *Graves v. Emp't Sec. Dep't*, 144 Wn. App. 302, 309, 182 P.3d 1004 (2008).

The PRA provides that

> *[a]ny person who prevails* against an agency in any action in the courts seeking the right to inspect or copy any public record or the right to receive a response to a public record request within a reasonable amount of time shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action.

RCW 42.56.550(4) (emphasis added). The PRA further provides that the superior court has the discretion to award "such person an amount not to exceed one hundred dollars for each day that he or she was denied the right to inspect or copy said public record." RCW 42.56.550(4).

Here, Twin Harbors was not the prevailing party in superior court. Because Twin Harbors was not the prevailing party, the superior court did not abuse its discretion in denying the request for PRA penalties and attorney fees. RCW 42.56.550(4)

D.      ATTORNEY FEES ON APPEAL

Twin Harbors argues that it is entitled to an award of attorney fees on appeal. We disagree.

This court may grant an award of reasonable attorney fees on appeal to a party that requests it in its opening brief, and as long as applicable law provides for such an award. RAP 18.1(a). As discussed above, "[a]ny person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record or the right to receive a response to a public record request within a reasonable amount of time shall be awarded . . . reasonable attorney fees." RCW 42.56.550(4).

Here, Twin Harbors is not the prevailing party on appeal. Therefore, we deny Twin Harbors' request for attorney fees on appeal. *See* RCW 42.56.550(4).

18

No. 54849-6-II

We affirm the superior court's order dismissing Twin Harbors' PRA claim.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, C.J.
Lee, C.J.

We concur:

_____
Maxa, J.

_____
Veljacic, J.